Okay. To those of you who weren't in here for the last argument, welcome. We're glad to have you. And welcome back to the people who were. And we'll now call the case 23-3168 Homeroom, Inc. v. City of Shawnee, Kansas. Counsel? Thank you, Your Honor. May it please the court, I'm going to do my best to reserve two or three minutes for rebuttal. I understand that's not my responsibility. This case is about your right to choose the people that you live with. Shawnee's ordinance was actually enacted with a targeted animus against my client, Homeroom. But they used a cudgel to accomplish that goal, and their ordinance has a much broader reach, such that it injures people and families like my client, Val French's family. She lived in her home with her husband and their two adult sons, and she invited one of the son's girlfriends in to live with the home, with them. Shawnee's ordinance... Let me ask you a question. The idea that this was targeted at Homeroom, that's not relevant for the issues you bring in this appeal, is it? Well, it is relevant to standing. I don't want to focus on standing. I'll discuss it towards the end. And I think it's also relevant to the extent that we're in a rational basis territory. I don't think that a targeted animus against a specific business is a rational basis for interfering with the associational rights of others. Okay. Let's do this. Start with standing, just so we're all sure that we've got someone before us who's able to make the argument. Sure, Your Honor. There was no question below that Val French has standing. Right. And there shouldn't be a question about Homeroom standing. There's really no daylight between this case and Craig versus Boren at the United States Supreme Court. Assuming we disagree with you, do we need to go further than Ms. French? No, you don't. The case will proceed without her. Out of a duty of advocacy for my client, Homeroom, these kind of issues come up in other jurisdictions. They may try to advance these rights in other circuits. And so we'd like a decision that confirms that they do have standing to bring these sorts of claims. But no, the case can proceed to the merits without Homeroom standing. Okay. Well, go ahead and give us your Craig v. Boren argument. Okay. Well, so, you know, there's two different issues when it comes to standing. First, you ask about the constitutional Article III standing. And all you need there is an injury that was caused by the challenge policy, and which could be redressable by a favorable decision. We've got that here. Homeroom's had to change its entire business model. That's an economic injury. It's the same one that was found in the MHDC case that's cited in our briefs. The second question is, are there prudential limits to Homeroom standing? And the prudential limit that the district court found was that they're trying to assert the constitutional rights of third parties. But just as in Craig, the enforcement of the ordinance against them would indirectly result in the violation of third party rights. And just as Craig was providing a service to its customers who had certain rights not to be treated in a discriminatory manner, so too here Homeroom is providing a service to tenants and residents who have a right to choose with whom they live in their home. So tell me your position on how the ordinance reaches directly to Homeroom. Well the... Give me a textual basis for that. Give you a textual basis? Yes, your honor. The way that the Shawnee code is written is that any owner or lessee or person who maintains property in violation of the code can be liable, even criminally liable. So that would certainly apply to Homeroom as a master tenant who leases, who sub-leases to its other tenants. So it's certainly directly enforceable against them. And in fact as we mentioned, the complaint is actually designed to target their operations. Well counsel, on the merits, you brought a facial challenge. And so of course that puts us beyond just looking at the French family and their circumstances or Homeroom. And I'm wondering how we can base a review of a facial challenge on your tying all of this in the due process claim to the right of intimate association, which then leads to hypotheticals about how much depth of intimacy there may be in certain relationships. And Val French's family may be one scenario, but what about a different scenario that's not predicated on this sort of close family with one other person? What about a scenario where it's a housing unit where it's largely a business transaction of who is living in the unit, where there may be very little to no interactions at all between roommates? How can we find a constitutional due process right to an intimate association in that type of scenario? Well, Your Honor, the Ninth Circuit found in basically considering similar scenarios that the right of people to live together, I mean we call it co-residence, the Ninth Circuit was talking about roommates, which I think is the scenario you're on. Well, but in Judge Kaczynski's opinion on roommates, he goes to great pains to talk about even unwashed dishes and all the sort of intimate interaction you have between roommates. But again, on a facial challenge, I'm looking beyond that. And I'm seeing again a housing structure where it doesn't fit the sort of maybe a house with an extra room or an apartment where there's one kitchen. I'm looking at different types of structures. And so how do we fashion a constitutional rule under a facial challenge of an intimate association without having to get into such factual depth as the intimacy of different type of roommate scenarios? Well, Your Honor, you fashion the rule by applying the test from cases like Roberts and cases like Duarte. What about Village of Beltaire? It seems to me that you're in the wrong court. I mean, we're happy to have you. But that the arguments that you're making are echoing Justice Marshall's righteous dissent in that case. But that's not the law. The law is what is in Beltaire. And how are we to rule for you and apply that law here? Well, the Beltaire case, Your Honor, did not consider the right of intimate association. It wasn't formally recognized for about another decade. Well, it considered the right of association. And it seems that your argument depends on us parsing that right as consisting of the right of intimate association. That's one thing. The right of expressive association, that's something else altogether. But haven't we understood this as the right of association? So it was squarely considered in Beltaire. And the court there, the Supreme Court, said that none of the list of fundamental rights, including that one, were implicated. That's right. And the court cited to the NAACP case, which is an expressive association case. And when you get to the intimate association cases, there the court does explicitly distinguish between the two different doctrines. And we're not arguing that there's some kind of expressive activity going on here that entitles them to constitutional protection. Rather, it's their right to choose with whom they live in their home. Those expressive association cases, neither those cases nor Beltaire applied the test, which looks at size, selectivity, purpose, and exclusivity. And when you apply that test, as the Ninth Circuit did in the roommate case, not only did it find that the roommate relationship qualified it, it found that it easily qualified. But the roommate's case didn't talk at all about Beltaire. It didn't distinguish it in the way that you're asking us to, which may be a principled distinction. Do you have any cases that have made the distinction you're asking us to make here between these sort of various facets of the right of association? Well, I don't know of cases distinguishing Beltaire on the issue of the right of intimate association. This may be the first one. Of course, we do argue that in the other context, if this court does not find that the right of intimate association is so easily findable here as the Ninth Circuit did and applies rational basis, then we argue that actually Cleburne is the most recent pronouncement from the United States Supreme Court on how to look at a zoning ordinance that distinguishes among the users of land based on their status and identity. Is that your rational basis with bite argument? Yes, Your Honor. I think the best way to look at it is that in that scenario where a zoning ordinance is discriminating against the users of land on the basis of their status and identity, the kind of rational basis scrutiny that you apply is a searching one. It's one that actually looks to the record. It's one that actually considers the justifications proffered by the defendant, not merely justifications that may have been conceived of. Has there ever been a case where a majority of the Supreme Court understood rational basis review to be somehow more exacting than traditional rational basis review? Your Honor, I think the way that the Supreme Court looked at this in Cleburne is that it is rational basis review as it applies to this sort of situation where the zoning ordinance is not regulating the use of land, it's not regulating the intensity of use, it's not even an occupancy limit. Just like in Cleburne where they said if the people occupying the home were not mentally handicapped but in all other respects the use of the property was the same, they would come out differently under the law and they couldn't find a rational basis to justify that. They considered the basis offered by the defendants and they didn't buy them. I think it's the same thing here where if a family is making the exact same use of a property, they're sharing the joys and the burdens of residential life, they're cooking together, they're sleeping next to one another. If they're making the exact same use in all other respects but their relational status is different, it comes out differently under the law. I don't know of a rational basis that could justify that kind of treatment on a Cleburne-like test. Your Honor? I should probably ask your opposing counsel this, but can you come up with any scenario in which this ordinance would be valid? I'm thinking, for example, a hospital rents a house and gives a key to four traveling nurses that come and go as they wish, don't know each other, never met before, and basically incident to employment, they come in and out of the house, share the house, share the kitchen. Well there may be some kind of, it seems in that case the issue there is not whether the nurses are related. Presumably the concerns you're pointing at would be the same. Assume they're not related. Well that's right, but the concerns you're pointing at don't have to do with whether or not they're related. So if the city wanted to regulate, I don't know, the amount of time that residents spend in their home or the length of leases, that might be one thing. But whether those nurses are related to one another or not doesn't seem to make much of a difference. What the city points to as their rational basis, what they say is obvious, is that they're trying to maintain the single family character of a neighborhood. But it's hard to square that with the fact that this ordinance applies everywhere in the city. So for Ms. French's family, as they choose to constitute themselves, maybe it's not how the city would define a family, but as Ms. French's family chooses to constitute itself, there's nowhere in the city of Shawnee that they can live together. Well that may be a good as-applied argument, but what I'm struggling with is the fact that both claims here are facial challenges to the ordinance. And so as we go into different areas of the city of Shawnee or different living scenarios, how do we fashion, again, a constitutional rule of application here when we're looking at it facially to decide if there's any scenario within the city limits where this ordinance could be constitutional? Your Honor, I think the answer is because the fact that this ordinance hinges on, which is the fact of the identity and the status, the relational status of the residential users of land, is simply not an appropriate fact for the government to be regulating. It's simply not within their police power, which may be ample to lay out zones where yards are wide and motor vehicles few, but is not ample to say that all throughout the city nobody can choose with whom they live if those people are not related to one another. Did you abandon the equal protection argument on this appeal? No, Your Honor. And so you would consider it adequately brief so that it's before us? Well, I think that the equal protection works out similarly to the due process analysis. Well, similarly, but it may not be the same. Well, I think that either you've got a fundamental right, in which case you have to apply strict scrutiny. There's no suspect class, or you're looking at rational basis. And I think that it's essentially the same as we treated them in the district court below, that we think the tests come out the same way, depending on if you find that the right of intimate association is infringed upon, as we say it is, and as the Ninth Circuit found it easily and clearly was. What the Ninth Circuit said is that choosing a person to live with implicates significant privacy and safety considerations. Restricting our ability to select our living companions would be a serious invasion of privacy, autonomy, and security. And aside from immediate family or romantic partner, it's hard to imagine a more intimate relationship. And that's what the Roberts case asks you to do. It says these relationships are on a spectrum. On one end, you've got the family. On the other end, you've got large, non-exclusive business enterprises. And if you try to locate people who live together in the same home, somewhere on that spectrum, they're going to be right there next to the family. I'm going to save my last minute for rebuttal. Okay. Thank you, counsel. Good morning. May it please the court. Andrew Holder on behalf of the City of Shawnee and its officials. Your honors, it is the City's position that the Supreme Court resolve the issue that is before this court in 1974 in the Village of Belterre case. I think that Judge Rossman hit the nail on the head when she asked, what about Belterre? Factually, the ordinance that issue in that case is very close to the ordinance that we're talking about here. Is the governmental interest the same? I think that the governmental interest is the same, yes. How is the governmental interest presented in the record before us, your interest? I think that, well, we're deciding this on a motion to dismiss standard, and I don't think that when the court is reviewing for rational basis, it doesn't have to look for a stated governmental interest in the record. The court's job is to see if it can conceive of any rational basis for it. Right. And the one that you're relying on from your, at least I got the sense in your briefing, was the one that was asserted and approved in Belterre. Yes, that's right, your honor. With respect to Belterre, I think the other point worth making is that, to my knowledge, there is no appellate court that has said, Belterre does not apply because it did not explicitly consider the right to intimate association as protected under the 14th Amendment. I agree that the court doesn't explicitly say that in there, but what the court does say is that a zoning regulation that limits the number of unrelated people that can live together does not impinge upon any fundamental right. Can you point us to any cases that sort of clarify that we should be understanding the right of association as including both the right of intimate association and expressive association? I think that, I believe it's in the Moore v. City of East Cleveland case. They analyze them separately, if I'm tracking your question, your honor. My question is actually the opposite. I think that your position depends on, Belterre says right of association, and if your case is to be controlled by Belterre, then you would ask us to reject the parsing that your friend on the other side is trying to do between the right of intimate and the right of expressive, that there is just a right of association Belterre controls. And I'm asking if there's a case that you can point us to that maybe says even though the right of intimate association and the right of expressive association maybe have different origins or roots, they're ultimately coextensive. I'm not sure that's exactly my position, your honor. My position is that in Belterre, the court analyzed the rights under the substantive due process clause, and it analyzed a whole host of different ones there, and ultimately what it says is there wasn't any right that was identified there. The court has had the opportunity, both in the Moore case and in the City of Cleveland case after that, to say, hey, since we decided Belterre, we've clarified our jurisprudence about what the right to intimate association under the 14th Amendment says, and in light of that, Belterre doesn't control anymore. They didn't do that in either of those cases. Had they done that, the analysis would have been a lot more straightforward. What they did is they said, Belterre is good law if you are differentiating between families and unrelated people. If you are zoning more restrictively than just saying blood marriage adoption, which is the Moore case, then the right to intimate association might cause a problem, but as long as you're evaluating under those terms, Belterre controls. Well, counsel, in terms of Bel... Well, I like to call it Belaterre, so I'm like the year Belterre, but under Belaterre, it says it involves no fundamental rights, and as a case for expressive association. So it seems that in order for us to say that that case now 50 years old still controls, even looking at the distinctions made in Moore and in Cleburne, is to also then have to ignore other Supreme Court cases that came about after Belaterre, such as Roberts and Duarte. So I think I'll at least say I'm trying to struggle with how do these two sort of line of cases merge together, if at all, and I'm not sure that's the right way to do it. Is that right? I think that cases such as Roberts identify what I would call the formula for evaluating whether a given relationship qualifies for constitutional protection or not. My position is that even though Roberts may have clarified the formula that we use to evaluate, the Supreme Court has had ample opportunity to say, well, now that we've cleared... The answer that we reached in Belaterre was wrong, and I'm not going to use an Italian accent to express that. I'm sure the questions before the Supreme Court, subsequent to Belaterre, such as in Moore and Cleburne, really gave them the opportunity to do what you're suggesting, to say, well, let's clarify, even though this question isn't before us, our holding in Belaterre and its broadest applications. And so, again, as we're here trying to figure out, if we look at these different bodies of law and how they may come together, it's a struggle. And particularly, let's go to Roberts. Would you agree that this case, as that opinion describes, is between the poles, right, in terms of the right to intimate association? It's not clearly established such as the right to marriage that's been expressly declared by the Supreme Court, but your opposing counsel has referenced the Ninth Circuit opinion that does go into more detail and analysis as to what does it mean to have roommates in the context of a constitutional right to intimate association. So if this case is between the poles and Roberts, and I'll tell you, I think it is, how do we square that analysis, again, with the Belaterre holding that doesn't really address that at all? Well, I guess to begin with, I do agree that it is between the poles. I think that the way the court identified the poles are, you know, you've got sort of marriage, childbirth, you know, educating children on the one side, and then on the other you've got sort of, I think the language that they use in there is, you know, maybe your employees at a large employer that you don't really have a constitutional right to intimate association with. So I totally agree that it's between those poles. I think that the way Belaterre has been interpreted says that on one side of that spectrum is family, as it was defined in that ordinance, and then on the other side of the spectrum is unrelated people. So although I agree it's between kind of the larger poles that were defined in Roberts, I think that there is no Supreme Court case that says, yes, it's between those poles, but you do have a constitutionally protected right to live with two or three or four or any number of unrelated people that you get to choose. I think that the Ninth Circuit in the Roommate.com case doesn't explicitly address that. They don't talk about Belaterre at all in that case. What happened in that case was the court was called upon to interpret the Fair Housing Act, and in an effort to avoid a potential constitutional issue, the court opted to interpret the Fair Housing Act in a manner that would avoid a potential constitutional problem. But there's no case law out there that says there is a clear constitutional problem in this situation for totally unrelated people, sort of in the hypothetical that you described, where it's more of a business transaction. But don't you think that case bolsters the heightened importance of relationships between unrelated individuals? I believe that, I mean, I think I agree that there's a heightened relationship as compared to a coworker in a large corporation, sure, but I don't think that that case or any other case says that it's heightened enough that you're entitled to constitutional protections from zoning ordinances, because I think Belaterre controls that. But it did give us factors, right? I mean, Roberts and then Durarte sets forth, I think, five factors, and as you apply those to determine sort of the depths of intimacy of the association, do any of those factors weigh in favor of your argument here, particularly as I think of the individual plaintiffs like Val French and her family? I mean, don't all of those factors sort of weigh in favor of the court finding that she does have a fundamental right of an intimate association, even given that one of the persons living under her roof was not related by blood? I don't think that the court could even get into those factors because Belaterre controls them. To the extent that there's any sort of uncertainty at this court's level about how we square Belaterre with Roberts or with Moore or with the city of Cleburne, that's something only the Supreme Court can answer for us. But I would say, again, I think that the court has had ample opportunity to say, hey, we've established the Roberts factors now, and in light of those, for example, in the city of Cleburne case, which was decided after Roberts, the court continued to cite Belaterre in a footnote in that case as an example differentiating its situation from the one in that case. And it talks about it in the, I believe it's footnote eight, talks about a zoning ordinance in Georgia that distinguished between related people and unrelated people. And that case relied on Belaterre. And in the city of Cleburne case, the court pointed out that unlike the Georgia case and unlike Belaterre, its case involved a distinction between people, a group housing for people with intellectual disabilities and other unrelated people. And so that's where I think you get into potentially, although it's an unresolved issue, the correct level review that applies in a case where there's a distinction among potentially historically disfavored groups. I think what the Tenth Circuit says about that is that no majority of the Supreme Court has ever formally recognized a rational basis with bite approach. And even if they did, it would only apply in the context of a historically unfavored group, which I don't think we have here. So I think when you look at Cleburne, decided post-Roberts, it says Belaterre is still good law and Belaterre still controls if you're just, the only distinction is between families and unrelated persons. Should we hesitate at all to rely on the governmental interest in Belaterre as being the one that you rely on when the appellant tells us that the ordinance here applies citywide? I think that, number one, when you're applying rational basis review, you're not required to determine whether the ordinance addresses its intended goal with razor-sharp precision. And I think that part of the goal of the ordinance really is twofold. Number one, maintaining the family characteristics, sort of like what we're talking about in Belaterre. And then number two... Of the whole city? The residential areas of the city. But does the ordinance apply citywide? Yes, it does. So I mean, I think that citywide, the other issue is making sure that it operates as a limit for the number of people that can live in a house to address overcrowding. How should we be thinking about the animus component that is alleged in the complaint? I think that, and to make sure I understand, are you talking about animus towards homeroom? Towards homeroom, yeah, their allegation. I don't think that that has any relation to what we're talking about here, because homeroom number one has no right to form or maintain intimate human relationships as a corporation. And so I don't think animus towards homeroom plays any role in this. Counsel, when we're looking at whether or not the basis put forward here in reliance upon Belaterre, this idea of like maintaining sort of family zones for residences, if that's rational, how would you respond to our critique that really this ordinance and ordinances like this tends to disproportionately affect lower income racial minorities, so really it's just a matter of affecting segregation based upon class and race? I think that number one, the ordinance on its face applies to all unrelated people. And number two, I would say that under rational basis review, it's not the court's role to determine whether a different type of zoning would better achieve the result or more fairly achieve the result or the goals that the city is after here. I want to, I believe I've covered, the one other area I want to make sure that I hit on is factual distinctions between this case and Belaterre. I believe in the reply brief, the appellants point out that there's a difference in the size of the city in the Belaterre case versus the city of Shawnee. In factually, I completely agree that's true, but there's nothing within that decision anywhere that says that the size of the location played any role in the court's decision. The other distinction that they attempt to make is the fact that the ordinance here would apply to owner occupied properties, but even they acknowledge that as far as we can tell from the record in the Belaterre case, that was true there, even though it happened to be the case that the plaintiffs in that case leased it out to college students. I don't think either of those factual discrepancies changes the outcome in any way, shape or form. My basic position would be that Belaterre has been on the books since 1974, has never been overruled, and to the extent that there is debate about whether the justifications proffered in that case satisfy rational basis review in light of cases like Cleburne, for example, that's something that only the Supreme Court can resolve. Thank you, counsel. Thank you. I believe we have a little bit of time left over. Thank you, counsel, and thank you, your honors. As far as the rational basis test not requiring the government to have any interest in the record, that's not how Cleburne worked. Cleburne looked to the interests that were proffered in the record. I'm glad that Judge Federico asked the question about potential stereotypes. I think these kinds of laws tend to have a stereotypical view of the sorts of people who live together who can't live with family. That's what underlies the proffered justification that we have to keep these a safe place for families. We're talking about these unrelated people. We're talking often about students, about people who can't afford to live on their own, about people who are immigrants, people who are newcomers, and the other thing that Cleburne says is that those kinds of stereotypes are not a justification, are not a rational basis. The last thing we'd ask for the court is to please apply the test as it's outlined in Roberts and Duarte. Thank you, counsel. You're out of time. We're going to take a quick break, five minutes, then we'll come back and finish the last two cases. Thank you very much.